**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| FREDERICK WILLIAM GULLEN, on behalf of himself and all others similarly situated, | Civil Action No.  15-cv-07681 |
| Plaintiff, | Hon. Jorge L. Alonso |
| v. | |
| FACEBOOK.COM, INC., | |
| Defendant. | |

**PLAINTIFF FREDERICK WILLIAM GULLEN'S OPPOSITION TO**
**DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................ii

I. INTRODUCTION ........................................................................................................1

II. FACEBOOK IS SUBJECT TO SPECIFIC PERSONAL JURISDICTION
FOR ITS INVASION OF ILLINOIS RESIDENTS' BIOMETRIC
PRIVACY IN VIOLATION OF THE BIPA ..............................................................2

    A. Applicable Legal Standard........................................................................................2

    B. Argument ..................................................................................................................3

III. THE MOTION TO DISMISS DISREGARDS THE PLAIN LANGUAGE
OF THE BIPA AND READS INTO THE STATUTE EXCEPTIONS
THAT THE LEGISLATURE DID NOT INTEND ....................................................9

    A. Applicable Legal Standards......................................................................................9

    B. Argument ................................................................................................................10

        1. Scans of Face Geometry Derived From Photographs Are Biometric
        Identifiers Under The Plain and Ordinary Meaning of the BIPA..............................11

        2. Statutory Construction and Legislative History Confirm BIPA's
        Applicability to Scans of Face Geometry Obtained from Photographs .....................12

            a. Statutory Construction ...................................................................................12

                i. Statutory Language and Structure......................................................13

                ii. Extrinsic Definitions.........................................................................15

                iii. Practical Consequences .....................................................................17

            b. The Legislative History Firmly Supports Plaintiff's Claims ....................21

CONCLUSION.......................................................................................................................25

i

## TABLE OF AUTHORITIES

**Cases**

*Abrahamson v. Ill. Dep't of Prof'l Regulation,*
  153 Ill. 2d 76 (1992) ................................................................................................... 9

*Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.,*
  751 F.3d 796 (7th Cir. 2014) ...................................................................................... 7

*Allied Van Lines, Inc. v. Gulf Shores Moving & Storage, Inc.,*
  No. 04 C 6900, 2005 WL 418032 (N.D. Ill. 2005) ..................................................... 5

*Am. Med. Ass'n v. 3Lions Publ'g, Inc.,*
  No. 14 C 5280, 2015 WL 1399038 (N.D. Ill. Mar. 25, 2015) ..................................... 6

*Bruso by Bruso v. Alexian Brothers Hospital,*
  178 Ill. 2d 445 (1997) ............................................................................................ 13, 14

*Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.,*
  88 F. Supp. 2d 914 (C.D. Ill. 2000) ............................................................................ 5

*Burger King Corp. v. Rudzewicz,*
  471 U.S. 462 (1985) ......................................................................................... 2, 3, 4, 6

*Carlson v. CSX Transp., Inc.,*
  758 F.3d 819 (7th Cir. 2014) ...................................................................................... 9

*Dawes v. Facebook Inc.,*
  No. 3:11-cv-00461-GPM-SCW, 2011 WL 12828872 (S.D. Ill. Dec. 8, 2011) ..................... 3

*DeLuna v. Burciaga,*
  223 Ill. 2d 49 (2006) ......................................................................................... *Passaim*

*Erie Railroad Co. v. Tompkins,*
  304 U.S. 64 (1938) .................................................................................................... 10

*ESCO Corp. v. Cashman Equip. Co.,*
  65 F. Supp. 3d 626 (C.D. Ill. 2014) ............................................................................ 6

*Felland v. Clifton,*
  682 F.3d 665 (7th Cir. 2012) ...................................................................................... 4

*Gridley v. Gridley,*
  399 Ill. 215 (1948)..................................................................................................... 15

*Halim v. The Great Gatsby's Auction Gallery, Inc.,*
  No. 03 C 8414, 2004 WL 434191 (N.D. Ill. 2004) ..................................................... 5

*Hawkins v. United States*,
  30 F.3d 1077 (9th Cir. 1994) .................................................................................24

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
  466 U.S. 408 (1984) ................................................................................... 2, 3, 7

*Hyatt Int'l Corp. v. Coco*,
  302 F.3d 707 (7th Cir. 2002) ..................................................................................8

*Jordan v. Dominick's Finer Foods*,
  No. 10 C 407, 2015 WL 4498909 (N.D. Ill. July 23, 2015) ........................... *Passim*

*Kraft Chemical Co. v. Salicylates & Chems. Private Ltd.*,
  No. 14 C 04186, 2015 WL 7888961 (N.D. Ill. Dec. 3, 2015) ...................................8

*Landis v. Marc Realty, L.L.C.*,
  235 Ill. 2d 1 (2009) ...............................................................................................15

*Lebowitz v. City of New York*,
  No. 12 CIV. 8982 JSR, 2014 WL 772349 (S.D.N.Y. Feb. 25, 2014) .....................19

*Lincoln Diagnostics, Inc. v. Panatrex, Inc.*,
  No. 07-CV-2077, 2008 WL 2246960 (C.D. Ill. May 29, 2008) ...............................4

*Medallion Prods., Inc. v. H.C.T.V., Inc.*,
  No. 06 C 2597, 2007 WL 3085913 (N.D. Ill. 2007) ...............................................4

*Monster Energy Co. v. Wensheng*,
  No. 15 C 4166, 2015 WL 5732050 (N.D. Ill. Sept. 29, 2015) .................................8

*People v. Holm*,
  387 Ill. Dec. 616 (Ill. App. Ct. 2014) ..................................................................10

*People v. Lewis*,
  223 Ill. 2d 393 (2006) .........................................................................................9, 12

Public Access Opinion
  No. 14-008, 2014 WL 4407615 (Ill. Att'y Gen. Aug. 19, 2014).........................16

*S. Illinoisan v. Illinois Dep't of Pub. Health*,
  218 Ill. 2d 390 (2006) ..........................................................................................13

*Timelines, Inc. v. Facebook, Inc.*,
  938 F. Supp. 2d 781 (N.D. Ill. 2013) .....................................................................8

*uBid, Inc. v. The GoDaddy Group, Inc.*,
  623 F.3d 421 (7th Cir. 2010) ..................................................................................5

*United States v. Sepulveda,*
115 F.3d 882 (11th Cir. 1997)......................................................................................24

*U.S. Fire Ins. Co. v. Barker Car Rental,*
132 F.3d 1153 (7th Cir. 1997 .......................................................................................9

*Varitalk, LLC v. Lahoti,*
No. 07 C 1771, 2007 WL 1576127 (N.D. Ill. 2007) .....................................................4

*World-Wide Volkswagen Corp. v. Woodson,*
444 U.S. 286 (1980) ....................................................................................................2

**Statutes**

Federal Rule of Civil Procedure 12(b)(6)......................................................................9

Biometric Information Privacy Act ("BIPA"), 740 Ill. Comp. Stat. 14/1 to 14/99
(West, Westlaw through P.A. 99-324 of 2015 Reg. Sess.) ....................................*Passim*

740 Ill. Comp. Stat. 14/10 ......................................................................................*Passim*

740 Ill. Comp. Stat. 14/15 ........................................................................................12, 15

740 Ill. Comp. Stat. 14/15(a)-(d) ...........................................................................*Passim*

**Miscellaneous**

*A Face Tells More Than A Thousand Posts:*
*Developing Face Recognition Privacy in Social Networks,* 26 Harv. J.L. & Tech. 165, 171 (2012)..............18

*Biometric Boom: How the Private Sector Commodifies Human Characteristics,* 25 Fordham Intell.
Prop. Media & Ent. L.J. 831, 849-50 (2015) ...........................................................18

Fretty, 16 Va. J.L. & Tech. at 454..............................................................................18

Jose Antonio Vargas,
*The Face of Facebook,* The New Yorker (Sept. 20, 2010)............................................22

Michael Cherry & Edward Imwinkelried, *A Cautionary Note About Fingerprint Analysis*
*and Reliance on Digital Technology,* Champion, August 2006, at 27, 28 .......................19

Paul F. Rothstein, *Federal Rules of Evidence,*
Rule 702, Practice Comment (I)(F) (3d ed., Dec. 2014) ...........................................19

Senate Bill 2400, § 10 (Feb. 14, 2008) .......................................................................23

Stephen Hoffman, *Biometrics, Retinal Scanning, and the Right to Privacy in the 21st Century*,
   Syracuse Sci. & Tech. L. Rep., Spring 2010, at 38 ..................................................................19

Plaintiff Frederick William Gullen ("Plaintiff"), on behalf of himself and the putative class, submits this opposition to the motion to dismiss (D.E. 20 (the "Motion to Dismiss")) filed by Facebook, Inc. ("Facebook").

## I.  INTRODUCTION

In enacting the Biometric Information Privacy Act ("BIPA"), 740 Ill. Comp. Stat. 14/1 to 14/99 (West, Westlaw through P.A. 99-324 of 2015 Reg. Sess.), Illinois banned unauthorized gathering of two distinct and separately defined things: (1) "biometric identifiers," which are defined as retinal scans, iris scans, voiceprints, fingerprints, and scans of hand or face geometry; and (2) "biometric information," i.e., any information that can be derived from biometric identifiers. Facebook gathers biometric identifiers – specifically, scans of face geometry – from thousands of Illinois residents without consent, causing widespread harm in Illinois.  Facebook therefore violates the statute, and its conduct easily satisfies the requirements of the state's long-arm statute.

Facebook does not deny that it gathers scans of face geometry without consent.  Instead, it argues that scans of face geometry are not biometric identifiers if they are derived from photographs rather than in person, because the definition of biometric information excludes information derived from photographs.  This argument fails for several reasons.  First, the exception for derivatives of exclusions pertains only to the definition of biometric information, not biometric identifiers.  Scans of face geometry are biometric identifiers, not biometric information.  Second, the statute says nothing about gathering biometric identifiers in person, and in fact expressly regulates biometric identifiers regardless of derivation.  Third, it would be senseless to permit unauthorized scanning from photographs but not in person.  All of the biometric identifiers covered by the statute are obtained from visual or audio media.  If the intermediation of a photograph or audio recording excused all subsequent processing into a biometric identifier, Facebook's interpretation of the exception would swallow the rule.

Facebook is free to gather photographs, and to gather information from photographs, but is not free to gather biometric identifiers from photographs. The Motion to Dismiss should be denied.

## II.     FACEBOOK IS SUBJECT TO SPECIFIC PERSONAL JURISDICTION FOR ITS INVASION OF ILLINOIS RESIDENTS' BIOMETRIC PRIVACY IN VIOLATION OF THE BIPA

Facebook argues, without offering a lick of evidence, that it is immune from personal jurisdiction in Illinois because it merely operated a website without any particular focus on doing business in the state. Its activities, however, went far beyond operating a website accessible by Illinois residents. As alleged in the class action complaint (D.E. 1 (the "Complaint")), Facebook collected photographs of Illinois residents and created biometric identifiers of Illinois residents, in massive numbers, without consent and in flagrant derogation of Illinois law. These allegations are sufficient for the Court to exercise specific personal jurisdiction over Facebook.[1]

### A.     <u>Applicable Legal Standard</u>

The Illinois long-arm statute authorizes the exercise of personal jurisdiction to the fullest constitutional limit. *See* 735 Ill. Comp. Stat. 5/2-209(c). The test for personal jurisdiction is whether the defendant has sufficient "minimum contacts" with the forum state that it "'should reasonably anticipate being haled into court'" there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Jurisdiction cannot be avoided "merely because the defendant did not <u>physically</u> enter the forum State." *Id.* at 476 (emphasis added).

The exercise of specific personal jurisdiction depends on "the relationship among the defendant, the forum, and the litigation." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). Jurisdiction is established where (1) the defendant has purposefully directed its

---

[1]     Nonetheless, if the Court has any reservations about the sufficiency of the jurisdictional allegations in the Complaint, Plaintiff requests leave to amend his Complaint.

activities at the forum state, *Burger King*, 471 U.S. at 472, or purposefully availed itself of the privilege of conducting business there, *id.* at 475, and (2) the alleged injuries "'arise out of or relate to'" the defendant's forum related activities, *id.* at 472 (quoting *Helicopteros*, 466 U.S. at 414).

### B. <u>Argument</u>

Facebook argues that its practice of scanning Illinoisans' faces for geometric points and contours has "nothing to do" with its business in Illinois, and that it is therefore not subject to specific personal jurisdiction in Illinois. The argument is unpersuasive.

The Complaint alleges, in pertinent part:

> Facebook is subject to specific personal jurisdiction in Illinois because (1) it has purposefully availed itself of the privilege of conducting business in Illinois and purposefully directed business activities into Illinois by, among other things, (i) registering itself to conduct business in Illinois; (ii) maintaining a physical office in Illinois, and (iii) targeting its facial recognition technology to millions of its users who are residents of Illinois; (2) <u>the injuries to Plaintiff and tens of thousands of other Facebook non-users residing in Illinois, whose biometric identifiers were collected and stored by Facebook from photographs uploaded by users residing in Illinois, arise from and are related to Facebook's activities in Illinois</u>; and (3) the exercise of personal jurisdiction over Facebook in Illinois comports with traditional notions of fair play and substantial justice.

(Compl. ¶ 10) (emphasis added)).

Facebook does not dispute that these allegations sufficiently establish a prima facie case of personal jurisdiction. Nor does Facebook contend, nor can it contend with a straight face, that it does not "purposefully direct" its business activities to Illinois residents, which would seem indisputable given that it has a sales and advertising office located in Chicago. *See* Memorandum of Law in Support of Defendant Facebook, Inc.'s Motion to Transfer Venue, *E.K.D. ex rel. Dawes v. Facebook Inc.*, No. 3:11-cv-00461-GPM-SCW, 2011 WL 12828872 (S.D. Ill. Dec. 8, 2011) ("Facebook has only 23 employees --primarily sales, account management, and ad operations staff -- in its Illinois office, which is in Chicago."). Thus, the first prong of the *Burger King* test is satisfied here.

Facebook's only argument is that its Illinois contacts do not "arise out of" or "relate to" the Plaintiff's injury. Although the Seventh Circuit has not determined the exact parameters for analyzing the second prong of *Burger King* and, in particular, whether it requires a "but for" analysis, a proximate causation analysis, or something in between, *see Felland v. Clifton,* 682 F.3d 665, 676-77 (7th Cir. 2012), Facebook's argument is unpersuasive under either test. Again, Facebook's main argument is that the "tagging" of photographs of Illinoisans by Illinoisans has "nothing to do" with (*i.e.,* does not arise out of or relate to) Facebook's business activities in Illinois. Facebook, however, "has created, collected and stored over a billion 'face templates' (or 'face prints') – highly detailed geometric maps of the face – from over a billion individuals, millions of whom reside in the State of Illinois." (Compl. ¶ 5.) Discovery will reveal just how many Illinoisans had their biometric facial data collected and stored by Facebook without their consent. But this is clearly not a situation where Facebook is being sued in Illinois merely because Illinois residents can "access" the Facebook website. Rather, it is a lawsuit that is being filed in Illinois because Facebook has caused a distinct, statutory privacy-based injury to Illinois residents that is directly related to its biometric tagging feature.

The Court's focus here should be that the Plaintiff and the members of the putative class are residents of Illinois who were injured in Illinois by virtue of photographs uploaded by Illinois Facebook users and then collected and stored by Facebook in violation of an Illinois-specific statute designed to protect the biometric privacy rights of Illinois residents. A long line of cases in this Circuit supports the exercise of personal jurisdiction under such circumstances. *See, e.g., Lincoln Diagnostics, Inc. v. Panatrex, Inc.*, No. 07-CV-2077, 2008 WL 2246960, at *13 (C.D. Ill. May 29, 2008) ("Moreover, Illinois has an interest in adjudicating this case because Plaintiff is an Illinois company and Defendant's alleged tortious activity caused injury in Illinois."); *Medallion Prods., Inc. v. H.C.T.V., Inc.*, No. 06 C 2597, 2007 WL 3085913, at *7 (N.D. Ill. 2007); *Varitalk, LLC v. Lahoti*, No. 07 C

4

1771, 2007 WL 1576127, at *6 (N.D. Ill. 2007); *Allied Van Lines, Inc. v. Gulf Shores Moving & Storage, Inc.,* No. 04 C 6900, 2005 WL 418032, at *3 (N.D. Ill. 2005); *Halim v. The Great Gatsby's Auction Gallery, Inc.,* No. 03 C 8414, 2004 WL 434191, at *4 (N.D. Ill. 2004); *Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.,* 88 F. Supp. 2d 914, 920 (C.D. Ill. 2000).

 This is not a run-of-the-mill Internet-based jurisdiction case where Facebook could potentially be sued in any one of the fifty states where a person happened to interact with its website. Rather, it is a case where Facebook is <u>only</u> likely to be sued in Illinois (the place of injury, the residence of injured class members, and the source of the uploaded photographs), California (its corporate headquarters) or Delaware (its state of incorporation). Thus, the <u>physical location</u> of the various moving parts giving rise to the claim, such as the location of the computer server where the biometric information was stored, is less important than the fact that the injury occurred to an Illinois resident by virtue of photographs uploaded by Illinois residents.

 This is consistent with the Seventh Circuit's ruling in *uBid, Inc. v. The GoDaddy Group, Inc.,* 623 F.3d 421 (7th Cir. 2010), which found that Illinois had specific personal jurisdiction over GoDaddy under the "arising out of" standard:

> The relationship between GoDaddy's Illinois contacts and uBID's claims is close enough to make the relatedness quid pro quo balanced and reasonable. GoDaddy has reached hundreds of thousands of people in Illinois with its advertising, which we know because it has made hundreds of thousands of sales in Illinois. …
>
> The concept of a geographical nexus is harder to apply to cases like this one, where the alleged wrong can fairly be characterized as occurring anywhere the Internet is accessible. In other words, uBID has the same claim against GoDaddy whether the customer who registered <ubidd.com> or another similar domain name did so from Illinois, from Wyoming, or from China. One conclusion we might draw from this fact is that a physical geographical nexus is simply less important in cases where the alleged harm occurred over the Internet. Such a conclusion would not necessarily be inconsistent with due process. After all, the geographical relationship between claim and contacts is only one facet of the constitutional inquiry. …

.…

> Where GoDaddy chooses to locate the servers that complete the task is irrelevant. The claim brought by uBID in Illinois arises directly out of GoDaddys registration of the infringing domain names bought by customers it has solicited in Illinois and many other states. The claim bears a sufficient relationship to GoDaddy's business activities in Illinois to expect GoDaddy to defend itself in Illinois without violating the due process clause.

*uBid*, 623 F.3d at 430-32; *see also, e.g., Am. Med. Ass'n v. 3Lions Publ'g, Inc.,* No. 14 C 5280, 2015 WL 1399038, at *3 (N.D. Ill. Mar. 25, 2015) ("The contacts between 3Lions and Illinois are not pervasive, but the connection between those limited contacts and the present litigation is sufficiently close that it does not offend traditional notions of fair play and substantial justice to require 3Lions to litigate the declaratory judgment count in this Court.").

Like GoDaddy, which specifically targeted Illinois residents, here it is also consistent with notions of fair play and substantial justice to allow Facebook to be sued in Illinois for violation of BIPA because it derives substantial revenue from business activities in Illinois (which we presume from Facebook's concession of prong one of the *Burger King* analysis) and the injury it caused was unique to Illinois residents, who should be given their day in a *local* courthouse. Logically speaking, Plaintiff's claim for violation of a BIPA thus "arises out of" Facebook's "tagging" activities in Illinois.

Even if Plaintiff's BIPA claim somehow could be deemed not to "arise out of" Facebook's scanning and tagging feature, the analysis would not end because the language of the second prong of *Burger King* is disjunctive, and thus Facebook is also subject to specific personal jurisdiction in Illinois if its tagging feature is "related to" Facebook's contacts with Illinois, which is arguably a less stringent standard. *See, e.g., ESCO Corp. v. Cashman Equip. Co.,* 65 F. Supp. 3d 626, 632 (C.D. Ill. 2014) ("The Supreme Court has not clearly defined the nexus necessary to satisfy the "arise out of or related to" requirement of the due process inquiry, but the Federal Circuit has noted 'that it is

significant that the constitutional catch-phrase is disjunctive in nature, indicating an added flexibility and signaling a relaxation of the applicable standard from a pure 'arise out of' standard.'") (emphasis added)); *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 n.10 (1984) ("We do not address the validity or consequences of such a distinction [between controversies that "relate to" a defendant's contacts with a forum and those that "arise out of" such contacts] because the issue has not been presented in this case.").

Notably, the Central District of Illinois in *ESCO*, a case concerning patent infringement, found specific personal jurisdiction based on "'the nature and extent of the commercialization of the accused products or services by the defendant in the forum.'" *ESCO*, 65 F. Supp. 3d at 633 (quoting *Avocent*, 552 F.3d at 1332). Likewise here, the Complaint alleges that Facebook's widespread commercialization of its facial recognition and tagging technology in Illinois has resulted in the violation of an Illinois statute and caused harm to Illinois residents (Compl. ¶¶ 10, 21-27, 45-51), and further that Illinois residents, to whom Facebook directed its technology, uploaded photographs of other Illinois residents, such as Plaintiff Frederick William Gullen, who were not members of Facebook and had not given Facebook permission to collect their face scans (*id.* ¶ 10). Such allegations sufficiently demonstrate that this controversy is, at the very least, "related to" Facebook's contacts with Illinois regarding its face scanning storage business.

The single case relied on by Facebook is inapposite. In *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2014), an Indiana company brought a lawsuit in Indiana against a nonresident corporation for trademark infringement. The Seventh Circuit concluded that sending misleading emails to, and making "a few" sales to Indiana residents did not support personal jurisdiction in Indiana because they were insufficient to show "a relation between the company and Indiana." *Id.* at 801. The facts here are completely different. Facebook is a social media website that, among other things, allows users to share photographs. That is the core

business of Facebook. Tagging and storing scans of face geometry are features of that core business. Facebook directly markets this product to <u>millions</u> of Illinois residents and advertisers. Discovery likely would reveal that Facebook derives <u>millions of dollars</u> in revenue from its tagging-related activities in Illinois.[2] The present lawsuit directly arises out of or relates to these extensive activities and contacts in Illinois, and concerns the violation of Illinois residents' rights under Illinois statutory law. This Court has already distinguished *Advanced Tactical* under similar circumstances:

> [D]efendants attempt to analogize this case to *Advanced Tactical*. There, the Seventh Circuit found that "it [was] unlikely that those few sales alone, without some evidence linking them to the allegedly tortious activity, would make jurisdiction proper." In other words, plaintiff provided "no evidence that those sales had any connection with this litigation." By contrast, here, MEC provides evidence that defendants offered to sell counterfeit Monster Energy Products, and MEC bases its claims on that specific tortious conduct of "offering to sell" counterfeit product in violation of the Lanham Act.

*Monster Energy Co. v. Wensheng,* No. 15 C 4166, 2015 WL 5732050, at *7 (N.D. Ill. Sept. 29, 2015). If offering counterfeit goods to Illinois residents is sufficient to establish personal jurisdiction in Illinois, wholesale violation of the BIPA by the world's largest photograph-sharing website presents at least as strong a basis for personal jurisdiction.

Indeed, Facebook itself has previously conceded that it is subject to personal jurisdiction in Illinois in a case alleging that the name of a feature on its website infringed an Illinois trademark holder's rights. *See Timelines, Inc. v. Facebook, Inc.,* 938 F. Supp. 2d 781, 784 (N.D. Ill. 2013) ("[Facebook] concedes personal jurisdiction is also proper in this District . . . ."). Facebook's wholesale violation of Illinois residents' privacy rights under the BIPA establishes an even more pointed basis for personal jurisdiction than the infringement of an Illinois trademark holder's rights.

---

[2]       If Facebook is disputing these facts, which it does not appear to be doing, the Court should conduct an evidentiary hearing after allowing reasonable discovery. *See Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 713 (7th Cir. 2002) (stating that if any material facts are in dispute in a 12(b)(2) challenge to personal jurisdiction, the court "must hold an evidentiary hearing to resolve them"); *Kraft Chemical Co. v. Salicylates & Chems. Private Ltd.,* No. 14 C 04186, 2015 WL 7888961, at *4 (N.D. Ill. Dec. 3, 2015) ("With respect to specific jurisdiction, however, there are material fact disputes necessitating an evidentiary hearing.").

This case involves a statutory right that is unique to residents of Illinois and therefore should be decided by a court sitting in Illinois. The Motion to Dismiss should be denied.

### III. THE MOTION TO DISMISS DISREGARDS THE PLAIN LANGUAGE OF THE BIPA AND READS INTO THE STATUTE EXCEPTIONS THAT THE LEGISLATURE DID NOT INTEND

On its face, the BIPA clearly and unambiguously defines Facebook's scans of face geometry to be biometric identifiers. This conclusion is confirmed by the canons of statutory construction, the practical consequences of Facebook's nonsensical interpretation, and the legislative history. The Complaint states a claim, and the Motion to Dismiss should be denied.

#### A. Applicable Legal Standards

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court "must construe [the complaint] in the light most favorable to plaintiff, accept well-pleaded facts as true, and draw all inferences in the plaintiff's favor." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014).

When interpreting state law, a federal court applies the rules of statutory construction applicable under state law. *See U.S. Fire Ins. Co. v. Barker Car Rental,* 132 F.3d 1153, 1156 (7th Cir. 1997) ("[W]e must apply the same rules of statutory construction that the Supreme Court of Illinois would apply if it were faced with the same task."). "In Illinois, the applicable principles of statutory construction are well established. The primary rule is that courts should ascertain and give effect to the intention of the legislature. To achieve that goal, we must regard the language of the statute as the best indication of legislative intent." *U.S. Fire Ins.*, 132 F.3d at 1156 (citing *Abrahamson v. Ill. Dep't of Prof'l Regulation,* 153 Ill. 2d 76, 90 (1992)); *see also DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006) ("When the language of the statute is clear, it must be applied as written without resort to aids or tools of interpretation."). Courts "will not depart from the plain statutory language by reading into the statute exceptions, limitations, or conditions that the legislature did not express." *People v. Lewis,*

223 Ill. 2d 393, 402 (2006) (citation omitted).

Where a statute requires interpretation and the exact legislative intent cannot be ascertained from the plain and ordinary meaning of its language alone, the court is guided by the canons of statutory construction and by legislative history, *People v. Holm,* 387 Ill. Dec. 616, 619 (Ill. App. Ct. 2014), and also by the practical consequences of the competing statutory interpretations, *Jordan v. Dominick's Finer Foods*, No. 10 C 407, 2015 WL 4498909, at *2 (N.D. Ill. July 23, 2015).

**B. Argument**

Section 10 of the BIPA states:

> 'Biometric identifier' means a retina or iris scan, fingerprint, voiceprint, or <u>scan of</u> hand or <u>face geometry</u>. Biometric identifiers do not include writing samples, written signatures, photographs, human biological samples used for valid scientific testing or screening, demographic data, tattoo descriptions, or physical descriptions such as height, weight, hair color, or eye color. . . .

> 'Biometric information' means any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual. Biometric information does not include information derived from items or procedures excluded under the definition of biometric identifiers.

740 Ill. Comp. Stat. 14/10 (emphasis added). The BIPA prohibits the possession, capture, collection, purchase, receipt through trade, or otherwise obtaining of both biometric identifiers and biometric information, absent express written consent. 740 Ill. Comp. Stat. 14/15(a)-(d).[3]

The plain language of the BIPA defines Facebook's scans of face geometry to be biometric identifiers. The analysis should end there. *See DeLuna*, 223 Ill. 2d at 52. But even looking past the plain language of the statute, Facebook's interpretation finds no purchase in the canons of statutory

---

[3]      Each BIPA restriction (*i.e.,* collection, possession and use) applies disjunctively to both biometric information and biometric identifiers. *See* 740 Ill. Comp. Stat. 14/15(a) ("A private entity in possession of biometric identifiers *or* biometric information must develop a written policy . . .); 740 Ill. Comp. Stat. 14/15(b) ("No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier *or* biometric information, unless it first . . .").

construction, the legislative history, or practical considerations. The Motion to Dismiss should be denied.

**1. Scans of Face Geometry Derived From Photographs Are Biometric Identifiers Under The Plain and Ordinary Meaning of the BIPA**

Under the plain language of the BIPA, the definition of "biometric identifiers" includes "scans of . . . face geometry." 740 Ill. Comp. Stat. 14/10. The definition does not contain any qualification relating to how the identifier was derived. Therefore, on its face, the statute encompasses biometric identifiers – i.e., scans of face geometry – derived from human faces depicted in photographs.

The Complaint is entirely consistent with the clear and unambiguous statutory language. The Complaint alleges that Facebook's sophisticated, patented facial recognition technology searches each and every user-uploaded photo for faces, and then scans those faces for geometric points and contours for purposes of creating and storing a digitized face template of each face. (Compl. ¶¶ 5, 13, 21-24, 30, 36.) The resulting face templates – not the innocuous photographs from which they were derived, but the resulting highly detailed digital maps of geometric points and measurements – are "scans of face geometry" and thus fall within the BIPA's definition of "biometric identifiers." (*Id.*)[4]

Facebook attempts to overcome the plain meaning of the statute in two ways. First, it points out that the definition of biometric identifiers excludes photographs, and then conflates this with the definition of "biometric information," which excludes information derived from items (such as photographs) that are excluded from the definition of biometric identifiers. This misses the mark. Information derived from photographs is excluded from the definition of biometric

---

[4]    The Complaint also alleges that Facebook collects "biometric information" (pertaining to gender, race and age) that is derived from the resulting "scans of face geometry." (Compl. ¶¶ 25, 32.) Because such information is derived from "biometric identifiers" as opposed to the photographs themselves, Facebook's unauthorized collection of this information also constitutes a violation of the BIPA. *See* 740 Ill. Comp. Stat. 14/10; 740 Ill. Comp. Stat. 14/15(a)-(d).

information, not from the definition of biometric <u>identifier</u>. The Complaint alleges that Facebook gathers biometric <u>identifiers</u> (scans of face geometry) from photographs. Facebook's argument therefore fails under the plain language of the statute. *See DeLuna*, 223 Ill. 2d at 52.[5]

Second, Facebook argues that the BIPA regulates only the "in-person" collection of biometric identifiers, not collection from photographs. The definition of biometric identifiers, however, contains no reference whatsoever to the source of the identifier. There is neither a requirement of in-person collection nor an exclusion of photographic collection. Moreover, on its face, the statute regulates biometric identifiers, regardless of derivation: "No private entity may collect, capture, purchase, receive through trade, <u>or otherwise obtain</u> a person's or a customer's biometric identifier[.]" 740 Ill. Comp. Stat. 14/15 (emphasis added). Facebook's argument to the contrary improperly "read[s] into the statute exceptions, limitations or conditions that the legislature did not express." *Lewis*, 223 Ill. 2d at 402. Again, Facebook's argument fails under the plain language of the statute.

The Complaint states a claim, and the Motion to Dismiss should be denied.

## 2. Statutory Construction and Legislative History Confirm BIPA's Applicability to Scans of Face Geometry Obtained from Photographs

Proper statutory construction and the legislative history confirm that the BIPA prohibits unauthorized gathering of biometric identifiers from photographs or other media, no less than unauthorized gathering of identifiers in person. All biometric identifiers are subject to the statute, regardless of derivation.

### a. Statutory Construction

Canons of statutory construction – including statutory language and structure, extrinsic

---

[5]  Facebook also argues that only information derived from biometric identifiers constitutes biometric information. (Mot. at 11.) But as discussed above, this argument is completely inapplicable to this case, because the Complaint does not allege that Facebook's scans of face geometry constitute biometric information. Facebook's scans of face geometry are biometric identifiers, which are separately defined and independently regulated under the statute.

meanings of relevant terms, and the practical consequences of Facebook's alternative interpretation – all confirm that the statute prohibits gathering scans of face geometry from photographs (or from any other source) without consent.

### i.      Statutory Language and Structure

"A fundamental principle of statutory construction is to view all provisions of a statutory enactment as a whole. Accordingly, words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute." *S. Illinoisan v. Illinois Dep't of Pub. Health*, 218 Ill. 2d 390, 415 (2006); *see also Jordan,* 2015 WL 4498909, at *2 ("[T]he statutory 'text' must be placed within its 'context' to be properly understood.").

Accordingly, differences in statutory language must be given force and effect, especially in adjacent provisions where parallel terms would be expected if truly intended. Thus, the Illinois Supreme Court reasoned in *Bruso by Bruso v. Alexian Brothers Hospital*, 178 Ill. 2d 445 (1997):

> Subsection (c) is clearly intended to act as an exception to both subsections (a) and (b). If the legislature had intended legal disability to be an exception for adults only, the logical place for that exception would have been in, or immediately following, subsection (a). The legislature, however, chose to locate the tolling provision for legal disability in a separate subsection following subsections (a) and (b).

178 Ill. 2d at 453. Similarly, the Court reasoned in *DeLuna*:

> If the legislature had intended subsection (e) of section 13–214.3 to apply only to the statute of limitations contained in subsection (b), it could have placed that tolling provision 'in, or immediately following,' subsection (b). However, the legislature chose, instead, to locate the tolling provision for minors in a separate subsection following subsections (b) and (c). It is, therefore, reasonable to infer that it was meant to apply to both.

223 Ill. 2d at 63-64.

In this case, the definitions of "biometric identifier" and "biometric information" differ at exactly the point where Facebook has placed all its chips. The definition of biometric identifiers contains a long list of items (such as photographs) that are excluded. 740 Ill. Comp. Stat. 14/10.

13

None of the many exclusions, however, says anything about identifiers <u>derived</u> from those exclusions. The definition of "biometric information," by contrast, contains just one simple exclusion: "information derived from items or procedures excluded under the definition of biometric identifiers." *Id.* Thus, the statute explicitly excludes such derivatives from the definition of biometric information, *but not* from the separate definition of biometric identifiers.

Notably, the words "identifiers" and "information" are separately defined and consistently used in a manner that confirms the exclusion of derivatives pertains only to biometric information, not biometric identifiers. The statute provides: "Biometric <u>information</u> does not include <u>information</u> derived from items or procedures excluded under the definition of biometric <u>identifiers</u>." *Id.* (emphasis added). The statute does not, however, exclude derivatives of the biometric identifier exclusions from the definition of biometric identifiers.

The Court must give meaning to these significant differences in statutory language and structure. The legislature could easily have provided for derivatives to be excluded from the definition of biometric identifiers, just as they are from the definition of biometric information. A parallel exclusion could have simply read: "Biometric identifiers do not include identifiers derived from items or procedures excluded under this definition of biometric identifiers." Or, as explained by *Bruso* and *DeLuna*, a single exclusion could have covered both definitions: "Biometric identifiers and biometric information do not include identifiers or information derived from items or procedures excluded under the definition of biometric identifiers." But there is no such exclusion. The legislature's decision to place an exclusion for derivatives solely in the definition of biometric <u>information</u> is clear evidence that the legislature intended for biometric <u>identifiers</u> to be regulated <u>regardless of derivation</u>. Accordingly, a scan of face geometry derived from a photograph constitutes a biometric identifier no less than any other scan of face geometry.

Facebook nevertheless argues that the phrase "scan of hand or face geometry", read together

with the other listed biometric identifiers, somehow describes "a common physical, in-person process for obtaining information[.]" (Mot. at 17.) But considered along side the statute's regulatory provision – "No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information," 740 Ill. Comp. Stat. 14/15 – this argument is completely meritless. As previously discussed, the catch all phrase "or otherwise obtain" clearly expresses the intent of the legislature to regulate biometric identifiers from any source, in person or otherwise (and to regulate biometric information from any source, except from an excluded identifier).

Facebook's manufactured in-person collection requirement is also plainly at odds with the statute's expressed application to biometric identifiers "purchase[d]" and "receive[d] through trade," which underscores that the legislature intended to regulate biometrics regardless of origin. How a biometric identifier is "otherwise obtain[ed]" by Facebook – whether in person or from a photograph – makes no difference; it is a biometric identifier nonetheless.

The Complaint states a claim, and the Motion to Dismiss should be denied.

### ii. Extrinsic Definitions

Extrinsic definitions of statutory terms, especially technical terms, are properly considered in statutory construction. *See Jordan*, 2015 WL 4498909, at *2 (stating that when a term "is not defined by the statute itself" or "by any applicable case law interpreting the statute," it is "appropriate to employ a dictionary to ascertain the meaning of an otherwise undefined word or phrase") (citing *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 8 (2009)); *Gridley v. Gridley*, 399 Ill. 215, 223 (1948) ("Technical words, or words of known legal import, must have their legal effect[.] When unexplained and uncontrolled by the context they are to be interpreted according to their technical meaning."). "Biometric identifier" is a term of art that would generally be understood to exclude ordinary photographs but include technologically-enhanced identifiers derived from photographs.

The term "biometrics" is defined as "the measurement and analysis of unique physical or behavioral characteristics (as fingerprint or voice patterns) especially as a means of verifying personal identity." Biometrics, Merriam-Webster, www.merriam-webster.com/dictionary/biometrics (last visited Dec. 17, 2015). Biometrics are characterized by the use of enhanced tools of measurement and analysis made possible by modern computing technology. *See generally* Steven C. Bennett, *Privacy Implications of Biometrics*, Prac. Law., June 2007, at 13, 14-15 ("The rise of mechanical biometric technology, especially computers and computerized databases, and the consequent automation of the identification process have radically increased both the ability to identify individuals biometrically and the potential for abuse of biometrics."); *see also* Public Access Opinion No. 14-008, 2014 WL 4407615, at *4 (Ill. Att'y Gen. Aug. 19, 2014) (stating, in context of Illinois FOIA statute, that "any clear photo of a person contains some biometric information," but a photo does not qualify as a biometric identifier "in the technical or legal sense" unless there is an "<u>intention to convert it to a template or match it against a face gallery</u>" (emphasis added)). Here, Facebook converts photographs into digitized templates and matches those templates against face galleries – the precise conduct the legislature intended to regulate.

In keeping with this ordinary understanding, including the understanding of the Illinois Attorney General, the BIPA regulates the use of such technologically enhanced "measurement and analysis" to collect individuals' unique identifying characteristics. *Id.* The BIPA regulates scans of the retina or iris, fingerprints, voiceprints, and scans of hand or face geometry, however they are obtained, all of which employ technological measurement and analysis to ascertain identity. *See* 740 Ill. Comp. Stat. 14/10. Conversely, the BIPA explicitly does not regulate commonplace and readily observable items that do not employ technologically enhanced tools of measurement and analysis to ascertain identity – items such as signatures, photographs and physical descriptions such as height, weight, hair color and eye color, *see id.*

16

Both the statute and the general definition of biometrics thus distinguish between technologically enhanced identifiers and commonplace items. The statute expresses the legislature's judgment that technologically enhanced identifiers require regulation. This fully explains the legislature's decision to regulate identifiers regardless of derivation. It is the use of enhanced "measurement and analysis" that necessitated legislative action. The enhanced measurement and analysis embodied in a biometric identifier (such as a scan of face geometry) derived from a photograph obtained second-hand is no different from (nor is it less invasive than) the enhanced measurement and analysis embodied in a biometric identifier obtained in person. The statute therefore applies equally to both.

In this case, the Complaint alleges that Facebook developed and implemented sophisticated technological tools of measurement and analysis to create millions of biometric identifiers – unique face prints – and then applied further tools of measurement and analysis to match those face prints against faces appearing in newly uploaded photographs. (Compl. ¶¶ 5, 13, 21-24, 30, 36.) Facebook thus "collect[s], capture[s], purchase[s], receive[s] through trade, or otherwise obtain[s]," 740 Ill. Comp. Stat. 14/15(b), as well as "possess[es]," 740 Ill. Comp. Stat. 14/15(a), biometric identifiers without proper consent in violation of the BIPA. (Compl. ¶¶ 4, 16, 19, 22, 26-27, 33-35.)

The Complaint states a claim, and the Motion to Dismiss should be denied.

### iii.    Practical Consequences

The practical consequences of a statutory interpretation are a strong indication of whether it is correct. *Jordan*, 2015 WL 4498909, at *2. Here, Facebook's argument that the statute applies only to scans of face geometry from in-person interaction is belied by the practical consequences of such an interpretation.

The statute defines biometric identifiers as including "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 Ill. Comp. Stat. 14/10. Every single one of

17

those identifiers depends in the first instance on the capture of a photograph or, in the case of a voiceprint, an audio recording.

Photographs are the raw material used by Facebook and others to create scans of face geometry in the use of facial recognition technology:

> Generally, the automatic face recognition process begins with an analysis of 'training images' of already known individuals and measurement of their facial features. These measurements – which make up the individuals' unique biometric data – are compiled into a biometric database along with other known information about them. Face recognition technology is then applied to a new photo to find faces and identify them. If it detects any faces in that photo, it 'normalizes' them, which involves transforming their scale, position, and lighting, and sometimes converting them into gray scale images so that they can more easily be compared to faces photographed under different conditions. The technology then identifies and measures facial features in the normalized faces. The resulting measurements are compared to biometric data in the previously compiled database to identify the faces detected in the new **photo**.

Yana Welinder, *A Face Tells More Than A Thousand Posts: Developing Face Recognition Privacy in Social Networks*, 26 Harv. J.L. & Tech. 165, 171 (2012) (emphasis added); *see also, e.g.,* Elizabeth M. Walker, *Biometric Boom: How the Private Sector Commodifies Human Characteristics*, 25 Fordham Intell. Prop. Media & Ent. L.J. 831, 849-50 (2015) ("Many individuals . . . lack an understanding of how privacy and security are affected by technology. . . . [B]iometrics can be captured without an individual's knowledge. A fingerprint can be lifted from another object, gait can be recorded from a distance, and face and voice samples are easily captured by cameras, phones, and other devices."); Fretty, 16 Va. J.L. & Tech. at 454 ("For FRT [face recognition technology] to function, the state needs pre-labeled photographs of its citizens, and the gathering of these photographs may implicate federal law as well as the Fourth Amendment. Governments already have proprietary control over four major sources of facial photos: arrestee mug shots, passport photos, driver's license photos, and border-entry photos of non-citizens. Agencies can be expected to exploit these resources to support FRT to the maximum extent allowed by law.") (emphasis added).

18

Retina and iris scans are likewise based in the first instance on photographs. *See, e.g.*, Stephen Hoffman, *Biometrics, Retinal Scanning, and the Right to Privacy in the 21st Century*, Syracuse Sci. & Tech. L. Rep., Spring 2010, at 38 (explaining that in retinal scanning technology, "the camera photographs the vasculature structure of your eyes and runs it against a database"); *Lebowitz v. City of New York*, No. 12 CIV. 8982 JSR, 2014 WL 772349, at *2 (S.D.N.Y. Feb. 25, 2014) ("Iris scans are high resolution photographs of the pigmented portion of the eye, and are more accurate than fingerprints in confirming identity."), *aff'd*, 606 F. App'x 17 (2d Cir. 2015).

Fingerprint recognition systems, too, are based in the first instance on photographs. *See, e.g.*, Michael Cherry & Edward Imwinkelried, *A Cautionary Note About Fingerprint Analysis and Reliance on Digital Technology*, Champion, August 2006, at 27, 28 ("If the police suspect that a criminal might have left a fingerprint impression on a particular surface, such as a glass tabletop, they can use techniques such as the application of special powders to visualize the image. When they find an image, they photograph it for comparison with the images in the library of fingerprint cards. . . . The law enforcement community is making extensive use of digitized technology in its fingerprint systems. In many cases, if the police succeed in visualizing a latent print at the crime scene, they use a digital camera to preserve the image.").

Voiceprints are not visual, but prove the point just the same. The first step in voiceprint analysis is obtaining a recording of the subject's voice. *See* Paul F. Rothstein, *Federal Rules of Evidence*, Rule 702, Practice Comment (I)(F) (3d ed., Dec. 2014) ("Voiceprint evidence attempts to identify a voice connected with a crime, by a process of reducing a recording of it to an electronically produced pictorial display and comparing it with a similar pictorial display of a known voice or series of voices.").

Facebook's interpretation of the BIPA as inapplicable to face scans collected from photographs is contrary to the very nature of biometric technology and thus would undermine the

statute's core purpose. Even in "in-person" collection, photographs of a face are the exact materials used to map out the unique geometric patterns that establish an individual's identity. Taken to its logical conclusion, Facebook's argument would exclude all the biometric identifiers from the definition of biometric identifiers, because they are all based on the initial capture of a photograph or recording. The legislature could not possibly have intended to expressly enumerate a series of "biometric identifiers," only to effectively exclude them in the following sentence because they are each derived from a photograph or recording. *See Jordan*, 2015 WL 4498909, at *2 ("[T]he interpretation of a statute must be grounded on the nature and object of the statute, as well as the consequences which would result from construing it one way or another. Legislative intent may be ascertained from the reason and necessity for the act, the evils sought to be remedied, and the objects and purposes sought to be obtained.") (citation omitted).

The "evil[] sought to be remedied" by the BIPA, *Jordan*, 2015 WL 4498909, at *2, is private industry's presumptuous arrogation of the right to apply hi-tech tools of measurement and analysis to create identifiers of private individuals without authorization. That is exactly what happened to plaintiff Frederick William Gullen, and it makes no difference that his picture was obtained second-hand from a third party who took or uploaded the image on which Facebook based its illegal face scan.

Indeed, Facebook's interpretation would deny the BIPA's promise of privacy precisely where it is needed most. The statute prohibits gathering biometric identifiers without consent. 740 Ill. Comp. Stat. 14/15(b). If an individual subjected himself or herself to an in-person photography session with Facebook, which is in the business of biometric identification through face-matching, it might be hard to deny that the individual had given consent.[6] The greatest evil occurs when privacy-

---

[6]     But even if consent were lacking from an in-person scan, Facebook would claim no harm because, after all, they only took photographs.

invading operators like Facebook obtain an individual's picture and create a biometric identifier without his or her consent, as happened here. By Facebook's logic, nothing would stop it from amassing a tremendous, Orwellian electronic database of face scans with no permission whatsoever so long as the database was derived from photographs. And indeed, that appears to be exactly what it is doing. The Illinois legislature has it right. The practice is offensive to reasonable expectations of privacy.[7] The statute should not be held inapplicable to the most compelling case for its application.

The Complaint states a claim, and the Motion to Dismiss should be denied.

### b. The Legislative History Firmly Supports Plaintiff's Claims

Facebook contends that Plaintiff's claims are inconsistent with the legislative history of the BIPA. Nothing could be further from the truth. The legislative history confirms that the BIPA prohibits Facebook's unauthorized activities.

The statute itself explains that regulation of biometrics is necessary because they embody an individual's immutable biological characteristics, and thus, unlike other identifiers such as social security numbers, cannot be changed in the event of a security breach:

> Biometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions.

740 Ill. Comp. Stat. 14/5(c). The statute notes that "[t]he full ramifications of biometric technology are not fully known," *id.* 14/5(f), and concludes that "[t]he public welfare, security, and safety will be

---

[7]     Facebook's biometrics database could ultimately be hacked or otherwise wind up in the hands of a nefarious actor who uses the data in a way that it was not intended. Facebook, unfortunately, cannot guarantee the security of that data any more than Target, Sony, or the Office of Personnel Management were able to ensure the security of their electronically-stored data. The BIPA was intended to prevent this risk of harm to innocent non-users by prohibiting companies from collecting and storing biometric data without consent. This is a laudable and legitimate legislative objective.

served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information," *id.* 14/5(g). On its face, the statute expresses a general intent to regulate and protect biometrics, for the purpose of preventing an irreversible security breach that would permanently expose an individual to identity theft and other evils.

Facebook argues that the statute applies only when biometrics are used to "'streamline[] financial transactions and security screenings,'" (Mot. at 13 (quoting 740 Ill. Comp. Stat. 14/5(a)), as a substitute for "'other unique identifiers . . .,' such as 'social security numbers'" (*id.* (quoting 740 Ill. Comp. Stat. 14/5(c)). This is a remarkably sloppy misreading of the statute. Financial transactions and security screenings are merely settings in which compromised biometrics might be misused. It would make no sense to safeguard biometrics only in those settings. Stolen identification – whether a social security number or a scan of face geometry – is a security threat no matter how, when, or where it was stolen. Facebook might as well argue that the theft of a wallet matters only if it occurs at a cash register, or that the theft of social security numbers matters only it if occurs in the context of a banking transaction. The argument is nonsense. The statute evinces no such crippling restriction on the regulatory scheme. Rather, the statute sensibly expresses a general, unrestricted intent to regulate "the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information," *id.* 14/5(g), to prevent all of the evils that may result from a breach of personal-identification security.

Facebook's attempt to emasculate the regulatory scheme is so illogical that it suggests the company simply has contempt for any law that interferes with the company's insatiable appetite for acquiring and exploiting personal information – the crux of the company's business model. *See* Jose Antonio Vargas, *The Face of Facebook*, The New Yorker (Sept. 20, 2010) (recounting that Facebook's CEO referred to its users as "dumb [expletives]" because they "just submitted" personal information and "they 'trust me'"). Here, Plaintiff is not even among those who have given

Facebook personal information; Plaintiff has chosen <u>not</u> to submit personal information, yet Facebook has <u>taken it anyway</u>, in plain violation of the BIPA.

Facebook additionally claims that amendments to the bill that became the BIPA indicate the legislature "declined to regulate all possible forms of facial recognition technology." (Mot. at 15 (emphasis omitted).) The successive iterations of the bill, however, merely streamlined the eventual statutory language and did not alter its applicability to the scans of face geometry at issue in this case. Facebook cites the Senate bill's definition of biometric identifiers as progressing from (1) "'any indelible personal physical characteristics'" including but not limited to, inter alia, "'records of hand or facial geometry'" (Mot. at 14 (quoting Senate Bill 2400, § 10 (Feb. 14, 2008) (emphasis omitted))), to (2) "'any indelible personal physical characteristics'" including but not limited to, inter alia, "'records or scans of hand geometry, facial geometry, or facial recognition'" (*id.* (quoting Senate Amendment to Senate Bill 2400, § 10 (Apr. 11, 2008) (emphasis omitted))). The Illinois House of Representatives then replaced the Senate definition with a more concise definition stating that "biometric identifier" means, inter alia, "scan of hand or face geometry."

According to Facebook, by replacing "records" with "scan," and by not adding "facial recognition" alongside "face geometry," the legislature "declined to regulate all possible forms of facial recognition technology." (Mot. at 15 (emphasis omitted).) This argument fails for several reasons. First, Facebook fails to establish that the amendments materially changed the scope of the statute, as opposed to merely refining and streamlining the statutory text. The term "records" was simply unnecessary in view of the statute's clear applicability to "possession," 740 Ill. Comp. Stat. 14/15(a), and to any effort to "collect capture, purchase, receive through trade, or otherwise obtain" biometric identifiers or biometric information, *id.* 14(15(b) – activities that would all necessarily either generate or pertain to some sort of record. Similarly, the term "facial recognition" was unnecessary because a scan of face geometry <u>is</u> a form of "facial recognition" technology; indeed,

facial recognition is the entire purpose of a scan of face geometry. The most sensible interpretation of the amendments is mere editorial revision for the sake of clarity and concision. *See, e.g., United States v. Sepulveda*, 115 F.3d 882, 885, n.5 (11th Cir. 1997) (interpreting statute based on plain language, and finding amendments inconclusive, because amendments may be made "'to clarify existing law, to correct a misinterpretation, or to overrule wrongly decided cases,'" such that "'an amendment to a statute does not necessarily indicate that the unamended statute meant the opposite'" (quoting *Hawkins v. United States*, 30 F.3d 1077, 1082 (9th Cir. 1994))).

Second, even if Facebook were correct (which it is not) that the amendments reflected some practicable distinction between scans of face geometry and other "possible forms of facial recognition technology" (Mot. at 15), the issue whether the scans of face geometry alleged in the Complaint qualify as regulated "scans of face geometry" or as supposedly unregulated other "possible forms of facial recognition" cannot be resolved on a motion to dismiss. Facebook not only fails to articulate the line between regulated and supposedly unregulated material, but does not even attempt to explain why the scans of face geometry alleged in the Complaint fall on the supposedly unregulated side of the line. The Complaint alleges specific unauthorized acts and omissions involving scans of face geometry. Those allegations must be accepted as true for purposes of the present motion to dismiss. Facebook cannot recast the Complaint as reciting activities involving an ill-defined class of unregulated material that Facebook has concocted for litigation purposes, when the Complaint specifically alleges acts and omissions pertaining to scans of face geometry. Even if anything had been left behind in the legislative process (which is not so), scans of face geometry were not, and any effort by Facebook to disprove the Complaint's allegations raises a question of fact that cannot be resolved on a motion to dismiss.

The Motion to Dismiss should be denied.

## IV.     CONCLUSION

For the foregoing reasons, the Court should deny the Motion to Dismiss (D.E. 20) in its entirety.


Dated:  December 21, 2015                         Respectfully submitted,

                                                  By: /s/ Katrina Carroll
                                                  Katrina Carroll
                                                  kcarroll@litedepalma.com
                                                  Kyle A. Shamberg
                                                  kshamberg@litedepalma.com
                                                  **Lite DePalma Greenberg, LLC**
                                                  Chicago Office
                                                  211 West Wacker Drive
                                                  Suite 500
                                                  Chicago, IL 60606
                                                  Telephone: (312) 750-1265

                                                  **CAREY RODRIGUEZ
                                                  MILIAN GONYA, LLP**

                                                  David P. Milian (*pro hac vice*)
                                                  dmilian@careyrodriguez.com
                                                  Frank S. Hedin (*pro hac vice*)
                                                  fhedin@careyrodriguez.com
                                                  1395 Brickell Avenue, Suite 700
                                                  Miami, FL 33131
                                                  Telephone: (305) 372-7474
                                                  Facsimile:  (305) 372-7475

                                                  ***Counsel for Plaintiff and the
                                                  Putative Class***

25

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on the 21st day of December, 2015, she caused a true and correct copy of the foregoing RESPONSE IN OPPOSITION TO THE MOTION TO DISMISS to be filed electronically with the Clerk of the Court to be filed and served on all parties via the Court's CM/ECF system.

By: */s/ Katrina Carroll*
Katrina Carroll